IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOHN G. VECCHIO,**            Case No. 1:16 CV 751

    Plaintiff,                        Judge Benita Y. Pearson

    v.                              Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                  REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff John G. Vecchio ("Plaintiff") filed a complaint against the Commissioner of Social Security ("Commissioner"), seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated March 28, 2016). Both parties have filed Briefs on the Merits. (Docs. 13 & 17). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB in January 2013, alleging disability as of September 2010. (Tr.164). The claim was denied initially and on reconsideration. (Tr. 100, 103). An administrative law judge ("ALJ") held a hearing in December 2014. (Tr. 35-80). Plaintiff (represented by counsel), Plaintiff's wife, and a vocational expert ("VE") testified at the hearing. (Tr. 42-79). Following the hearing, the ALJ issued an unfavorable decision. (Tr. 19). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on March 28, 2016. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony[1]

Plaintiff was born April 6, 1962, and was fifty-two years old on the day of the hearing. (Tr. 83). He has a high school education, (Tr. 42-43), and past work experience as a laborer (Tr. 44).

*John G. Vecchio*

Plaintiff served in the US Navy from 1986-1988. (Tr. 279). When he was deployed, he went AWOL for three to four months. (Tr. 63). Regarding why he left, Plaintiff first stated "his first wife wanted [him] out of it" (Tr. 279); then, later, stated he has "no idea" (Tr. 64). In 1989, Plaintiff worked for Golper Operation. (Tr. 61). He was terminated because he "just stopped showing up". *Id*. Plaintiff has moved out of his current home seven times over the past fourteen years due to the fact he would "fly into rages". (Tr. 59).

Between 1999 and 2001, Plaintiff worked for flooring company, Nature Stone. (Tr. 44). He was a laborer. *Id*. "[E]very few months," Plaintiff would not come in. (Tr. 57). To that end, he stated he "wouldn't get out of [his] bedroom, sometimes not out of [his] bed." *Id*. His employment ended because "[he] stopped going into work, and [he] had gotten angry at some people that [he] worked with", which resulted in arguments and "fights during work." (Tr. 56). Between 2003 and 2007, Plaintiff worked as a finisher for Complete Personnel Logistics Incorporated and MEA Incorporated. (Tr. 45).

---

1. A claim for benefits must be established during the relevant time frame. *Strong v. Comm'r of Soc. Sec.*, 88 F. App'x 841, 845 (6th Cir. 2004). Thus, any discussion of evidence that pre-dates the alleged onset date are for historical purposes and not for the purpose of establishing entitlement to disability.

Regarding whether Plaintiff was having mental impairments that limit his ability to work, Plaintiff states, "in just about every aspect." (Tr. 50). He states he "get[s] overwhelmed", has a "hard time talking to people on certain days", and "mak[ing] decisions." *Id*. Plaintiff states "[o]ther days, it's fine." *Id*. He states "[his] problem often is to be able to get out of [his] bedroom and perform the smallest tasks." *Id*. He states "[t]he companies can't count on [him] to be there to perform the duties." *Id*.

Plaintiff states he has depression. *Id*. He "[has] been known not to come out of his room other than for food months at a time" and has "crying spells" three times per week. (Tr. 50-51). He has no hobbies or activities that he enjoys. (Tr. 51). He gets three to four hours of sleep each night. *Id*. Regarding why he does not get more sleep, Plaintiff states there are times he "simply can't sleep" and that "[t]oo many things [were] racing through [his] mind." *Id*. Sometimes he will sleep for fifteen hours a day "depending." *Id*. He was having these problems in 2011. *Id*.

Since 2011, Plaintiff states his mental health has gotten worse. *Id*. He states he and his wife have "learned how to manage [the symptoms] and what things to do and what not to do to bring on some of these things." *Id*. He and his wife try to reduce stressful events. (Tr. 51-52). Plaintiff states, "for the most part, [he] does not leave [his house] without [his] wife." (Tr. 52). Regarding when he drives, he "sometimes [] forget[s] where [he is] going and how to get there." (Tr. 42). Plaintiff testifies "whatever [he] need[s] to do, [his] wife does [it] for [him]". (Tr. 52).

Regarding whether Plaintiff gets along with people he states he stays in his bedroom when he is "in the wrong state of mind." *Id*. Plaintiff testifies he does not answer his phone or talk to people at the store. *Id*. He has one friend that he talks to every "month or so" by text. *Id*. Regarding any problems controlling his temper, Plaintiff states "[he] [does] a lot of raging, ranting, and going

3

off to the point that the kids all leave the house" and his wife "goes in the other room." (Tr. 53). He does not go to bars or restaurants. *Id*. He does not drive "as much" due to "road rage". *Id*.

In March 2011, Plaintiff tried to open a handyman business. (Tr. 43). He states he was "unable to continue it." *Id*. He tried to obtain customers, but he could not "stay on the job long enough to complete it" and he "couldn't promise that [he] would actually be there on days [he promised he would] be there." *Id*. Plaintiff states "[his] disease had gotten in the way." *Id*.

Also in 2011, Plaintiff went to Portage Path Behavioral Health. (Tr. 53). He states it was "difficult" for him to make and keep appointments. (Tr. 54). He states it was difficult for him to make appointments, "especially if [he] was in bed sick." *Id*. He could not wait in the waiting room. *Id*. He could not afford the medication. *Id*.

Plaintiff also completed an Adult Function Report for the agency. (Tr. 202). He noted his social activities included playing computer games, and watching television and movies with his wife and children. (Tr. 209). Plaintiff prepares his own meals, such as a sandwich, or frozen or grilled food. (Tr. 206). He does the laundry and loads the dishwasher. *Id*. Plaintiff indicates he drives a car and walks. (Tr. 208). Plaintiff visits with family, though not often. (Tr. 210). Plaintiff gets along with authority figures "ok". (Tr. 212). He has never been laid off as a result of not getting along with other people. *Id*.

### *Elizabeth Vecchio*

Plaintiff and Ms. Vecchio have been married for fourteen years. (Tr. 65). They live together. *Id*. Ms. Vecchio does not work. (Tr. 67). She states Plaintiff would "get so angry, [that he would] flip a table". (Tr. 65). Ms. Vecchio states Plaintiff "cannot leave the house without [her]." (Tr. 68). She states "it's so severe to the point where if he was to get called to work, [she] would have to go with him and drive with him so he could not be driving with others." (Tr. 69).

4

She would go to work with him "every day." *Id*. She would stay at Plaintiff's work "the whole time". *Id*. Ms. Vecchio states Plaintiff talks to himself while he cuts the grass. (Tr. 66-67).

Ms. Vecchio has to go with Plaintiff "everywhere." (Tr. 71). She states there are times Plaintiff does not leave his room for "three months, two months, six months." *Id*. She feels she cannot leave him by himself. (Tr. 72).

<u>VE Testimony and ALJ Decision</u>

A VE testified at the ALJ hearing. (Tr. 74-80). The ALJ first asked the VE to consider a hypothetical individual with Plaintiff's age, education, and vocational background who could

> [o]ccasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, stand or walk six hours, sit six hours in an eight-hour workday [] with normal breaks. Push or pull consistent with the lifting limitations. Occasionally climb ladders or scaffolds, occasionally climb stairs, frequently climb ramps, frequently stoop, kneel, crouch, or crawl. The individual is limited to simple, routine, and repetitive tasks. The individual is limited to work involving only occasional decision making, occasional changes in the work setting, and no strict quota requirements. The individual can occasionally interact with the public, coworkers, and supervisors.

(Tr. 74-75). The VE testified such an individual could not perform Plaintiff's past work, but could work as a kitchen helper, a cook helper, or a commercial cleaner. (Tr. 75). The ALJ then asked the VE to again consider the first hypothetical, but added the limitations of: (1) being absent on an unscheduled basis more than one time per month; (2) being off task 20 percent of the day in addition to regularly scheduled breaks; and (3) intermittent explosive outbursts in the work setting. (Tr. 75-76). The VE stated there would not be any jobs at all in the national economy under those circumstances. (Tr. 76).

In his written decision, the ALJ concluded Plaintiff last met the insured status requirements on December 31, 2011, has not engaged in substantial gainful activity since his alleged onset date through his date last insured, and has severe impairments of "bipolar disorder and anxiety

disorder." (Tr. 24). He concluded these impairments did not meet or equal the listings and Plaintiff retained the residual functional capacity ("RFC") to perform:

> simple, routine, and repetitive tasks; occasionally make work-related decisions; occasionally deal with changes in the work setting; never deal with strict quota requirements; and occasionally interact with the public, coworkers, and supervisors.

(Tr. 26). Based on the VE's testimony, the ALJ concluded Plaintiff could perform jobs in the national economy and therefore was not disabled. (Tr. 30).

Medical Evidence between September 3, 2010 and December 31, 2011[2]

In May 2011, Plaintiff began counseling services at Portage Path Behavioral Health. (Tr. 278). He described his relationship with his father as "good" and his relationship with his siblings and children as "very good." (Tr. 281). In a clinical evaluation by a licensed social worker, Plaintiff stated he has no flashbacks and that he only has a diminished interest and participation in meaningful activities "at times." (Tr. 287). The clinician noted Plaintiff had a euthymic mood; was well groomed; had appropriate affect; was of average intelligence; was oriented to time, place, and person; had a logical thought process; but, was of impaired memory and judgment. (Tr. 294-95). The clinician diagnosed Plaintiff with bipolar disorder and cognitive disorder, gave him a GAF score of 41[3], and recommended individual therapy with a licensed social worker Charles L. Goold. (Tr. 296-97).

---

2. Plaintiff bears the burden of proving his impairment became disabling prior to the date his insurance status expired. 20 C.F.R. § 404.131(a).
3. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.") *DSM-IV-TR*, at 34. While the GAF scale is no longer used, *Judy v. Colvin*, 2014 WL 1599562, at *7 (S.D. Ohio), it "may assist an ALJ in assessing a claimant's mental RFC." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016).

Plaintiff began seeing Mr. Goold on May 26, 2011. (Tr. 633). Mr. Goold noted Plaintiff was "very animated and engaging while conversing". (Tr. 632). Plaintiff either cancelled or was a "[n]o [s]how" at his next three appointments. (Tr. 634-39).

Third-Party Statements

Plaintiff submitted several third-party statements in support of his claims. His sister, Johanna Costello stated Plaintiff's mental illness "sabotage[s] all efforts to help him." (Tr. 243). Ms. Costello also stated Plaintiff "would suddenly quit his job or just not show up and disappear for lengths at a time." *Id*. She stated custody of Plaintiff's daughter was granted to his mother-in-law because of his "mental illness." *Id*. In the spring of 2011, Ms. Costello and her husband hired Plaintiff to do renovations. *Id*. Plaintiff would not show up for "days at a time." *Id*. Plaintiff confirms he is coming to family events but "never calls or shows." *Id*. "[Plaintiff's] life is controlled by his mood changes, breakdowns and depression that negatively impact all of his relationships with family, friends and employers." (Tr. 244).

Plaintiff's oldest brother, James Vecchio ("Mr. Vecchio"), stated Plaintiff's employment opportunities with his father, who was a real estate developer, ended with similar results: "[Plaintiff] would walk away from his position by not coming to work, without warning or explanation." (Tr. 245). Plaintiff would make "physical threats to tenants, sub-contractors, work associates and supervisors when he was under stress to perform as expected." (Tr. 246). "[Plaintiff] was not able to endure the stress of even the most minor everyday occurrences in his job duties." *Id*.

Mr. Vecchio testified a real estate developer outside the family hired Plaintiff to collect rent and deal with sub-contractors. *Id*. Plaintiff was "verbally abusive to his tenants if they did not pay." *Id*. "Other times if a subcontractor failed to perform as required he would fly off the handle,

7

unilaterally terminate their contract and cause further delay to projects by his actions." *Id*. Plaintiff was terminated. *Id*.

As a business owner, Mr. Vecchio stated he "cannot afford to have someone like Plaintiff who has regular and frequent unexcused absences, without warning or explanation." (Tr. 247). He stated he has never known Plaintiff to work for a month without missing one or two days due to mental health issues. *Id*. Mr. Vecchio stated some absences would "be for weeks on end." *Id*. Mr. Vecchio stated Plaintiff is "volatile" and that this creates a "significant potential liability" for an employer. *Id*.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can claimant perform past relevant work?

5. Can claimant do any other work considering his RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*. The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id*. Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff makes several arguments. First, Plaintiff argues the ALJ erred at Step Three by finding Plaintiff's impairments do not meet Listing 12.04. Second, Plaintiff argues the ALJ erred at Step Five by: (1) failing to accord controlling weight to the opinion of Susan Barker, MSN, CNS; (2) either "ignor[ing] or dismiss[ing]" a third-party report by independent VE Ronald Smolarski; and (3) failing to explain why he "rejected" certain VE testimony. Third, Plaintiff argues Step Five is in error because the VE failed to consider Plaintiff's "mental illness" in responding to the ALJ's hypotheticals.

Step Three: Listing 12.04

A claimant bears the burden of showing he meets or equals a listing impairment. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). If a claimant meets or equals the requirements of a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(d). In order to determine whether a claimant's impairment meets a listing, the ALJ may consider all evidence in a claimant's record. §§ 404.1520(a)(3), 404.1526(c). In reviewing an ALJ's listing determination, there is no requirement for "heightened articulation" by the ALJ, as long as the finding is supported by substantial evidence. *Bledsoe v. Barnharts*, 165 F. App'x 408, 411 (6th Cir. 2006) (citing *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986) (an ALJ's step-three determination is not to be overturned unless it is legally insufficient)).

Plaintiff argues, had the ALJ considered a letter by clinical counselor Dalia Puskorius, MA, LPCC-S as well as third-party statements and testimony by Plaintiff, his wife, brother, and sister, the ALJ should have found Plaintiff meets the requirements of Listing 12.04. (Doc. 13, at 5-7) ("Apparently the ALJ either ignored or did not appreciate said testimony"). The undersigned disagrees.

First, contrary to Plaintiff's assertion, the ALJ did consider Plaintiff's third-party statements from his sister, and brother, as well as testimony from his wife, and afforded them "partial weight." (Tr. 28). The ALJ stated:

> However, the record does contain several third party statements as well as testimony from the claimant's wife. At hearing, she said the claimant rarely leaves his room. She also said the claimant has angry outbursts and is sometimes violent. Mrs. Vecchio indicated the claimant had significant difficulties getting along with others at his past job. (Hearing Testimony.) Additionally, the record contains a statement from the claimant's sister, Johanna Costello. In December of 2014, Ms. Costello said the claimant has a long history of mental health symptoms, including going missing for periods of time, erratic behavior, fits of rage, and mood swings. The claimant's brother, James Vecchio gave similar states [sic] including self-destructive behavior and an inability to deal with stress. (Exhibit 10E). The undersigned has considered these statements in making the above findings. Although it is clear that the claimant's family believes he is unable to work, there is simply insufficient evidence of objective abnormalities to support a finding of disability prior to the date last insured. The record contains no opinion evidence to support the third-party statements, and the claimant's course of treatment during the relevant period does not suggest significant mental limitations. Accordingly, the third-party statements have been given only partial weight.

*Id.*

Second, regarding Plaintiff's own testimony, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005) (quoting *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)). Here, while the ALJ may not have discussed the testimony cited by Plaintiff, the ALJ did state he considered the record as a whole. (Tr. 26). Thus, the ALJ's failure to discuss the evidence identified does not mean he did not consider it.

Third, Ms. Puskorius's letter, as well as Plaintiff's sister's and brother's third-party statements, post-date Plaintiff's date last insured of December 31, 2011 and is, therefore, of little probative value. (Tr. 83). "In order to establish entitlement to disability insurance benefits, an individual must establish that he became 'disabled' prior to the expiration of his insured status."

*Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) (citing 42 U.S.C. § 423(a) and (c); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "Evidence of a disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (citing *Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264 n.6 (6th Cir. 1988)). Such evidence is "only relevant to a disability determination where the evidence 'relates back' to the claimant's limitations prior to the date last insured." *May v. Astrue*, 2011 WL 3490186, at *5 (N.D. Ohio) (citing *Barnett v. Sec'y of Health & Human Servs.*, 1987 WL 36614, at *3 (6th Cir. 1987)).

Here, Ms. Puskorius's letter is dated November 2014, and the third-party statements by Plaintiff's sister and brother are dated November and December of 2014. (Tr. 35, 244, 247, 580). Further, Plaintiff fails to argue the evidence "relates back" to before his date last insured. Therefore, the Court finds the ALJ was not in error if he did not consider the evidence identified by Plaintiff in deciding Plaintiff did not meet Listing 12.04. *See May*, 2011 WL 3490186 at *5 (declining to consider evidence where "Plaintiff d[id] not explain why or how [the evidence] were reflective of his abilities prior to [Plaintiff's date last insured]").

As stated, it is Plaintiff's burden to show he meets or equals a listing impairment. *See Her*, 203 F.3d at 391. The Court finds the Plaintiff has failed to meet his burden.

Moreover, even if substantial evidence or indeed a preponderance of the evidence supports Plaintiff's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The Court finds substantial evidence supports the ALJ's conclusion that Plaintiff does not meet the requirements of Listing 12.04.

Listing 12.04[4] states:

> 12.04 Affective Disorders: Characterized by a disturbance in mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied[5].
>
> * * *
>
> B. Resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. § Pt. 404, Subpt. P, App. 1. To meet Listing 12.04, Plaintiff must exhibit "marked" or "extreme" functional limitations in two or more of the relevant "B" categories. *Dorn v. Comm'r of Soc. Sec.*, 2015 WL 502142, at *8 (S.D. Ohio), *report and recommendation adopted*, 2015 WL 1020180 (S.D. Ohio).

*Activities of Daily Living*

Regarding activities of daily living, the regulations provide as follows:

Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and

---

4. The Social Security Administration revised the medical criteria for evaluating mental disorders effective January 17, 2017. 81 FR 66138 (S.S.A.), 81 FR 66138-01, 2016 WL 550752, at *1. However, because the prior version was in effect at the time the ALJ rendered his opinion, the Court utilizes that version in its review of that determination.

5. The Commissioner concedes Plaintiff meets Listing 12.04's paragraph "A" criteria, (Doc. 17, at 7), and the Plaintiff fails to argue the listing's paragraph "C" criteria (Doc. 13, at 4-5). The Court will, therefore, focus exclusively on whether Plaintiff's impairments meet or equal the paragraph "B" criteria.

using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (2015), § 12.00.

The ALJ found Plaintiff had moderate restrictions in activities of daily living. (Tr. 25). Substantial evidence supports this determination. While Plaintiff states he needs help with personal care tasks and taking medication (Tr. 206), he was described as "well groomed" in May 2011 (Tr. 621). Plaintiff is capable of loading the dishwasher, doing laundry, and preparing simple meals. (Tr. 206). Plaintiff watches television and movies with his wife and kids. (Tr. 209). Plaintiff's wife's testimony Plaintiff cannot leave the house without her (Tr. 68) is contradicted by Plaintiff's statement that he recently got a haircut and went to Goodwill "on [his] own" (Tr. 52). Finally, Plaintiff cuts the grass. (Tr. 66).

Based on this evidence, the undersigned finds substantial evidence supports the ALJ's conclusion that Plaintiff can sustain his daily living activities. *See Phillips v. Comm'r of Soc. Sec.*, 2012 WL 112610, at *2 (N.D. Ohio) (finding substantial evidence supports an ALJ's finding of moderate restrictions in daily living where the plaintiff "continues to be able to drive a motor vehicle and is independent with all activities of daily living, including cooking and household tasks").

*Social Functioning*

Regarding social functioning, the regulations provide as follows:

Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social

14

contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

20 C.F.R. § Pt. 404, Subpt. P, App. 1(2015), § 12.00.

The ALJ found Plaintiff had moderate difficulties in social functioning. (Tr. 25). Substantial evidence supports this determination. While Plaintiff reported he does not come out of his room for months at a time, (Tr. 50-51), he stated he does things with his family, though "not often." (Tr. 210). He also stated he watches television and movies with his wife and children once or twice a month. (Tr. 209). Plaintiff has "very good" interpersonal relationships with his siblings and children. (Tr. 281). While Plaintiff states he has problems getting along with others, (Tr. 210), he has a friend he talks to about "every month or so" and he characterizes his former employers as "very good friends of [his]" (Tr. 52, 56). Finally, Plaintiff gets along "ok" with authority figures, (Tr. 212), and, in May 2011, his counselor described his mood as "appropriate" and "euthymic" (Tr. 294).

Based on this evidence, the undersigned finds substantial evidence supports the ALJ's conclusion that Plaintiff can sustain social functioning. *See Vanarnam v. Comm'r of Soc. Sec.*, 2014 WL 1328272, at *19 (E.D. Mich.) (finding substantial evidence supports the ALJ's finding of moderate restrictions in social functioning where: (1) medical source statements described the plaintiff as "polite and cooperative", "pleasant", and "calm and affable"; (2) the plaintiff lived with his wife and children during the time before his date last insured; and (3) anger at work was the result of "pressure to work rather than being attributable to any clinical impairment").

*Concentration, Persistence, or Pace*

Regarding concentration, persistence, or pace, the regulations provide as follows:

> Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (2015), § 12.00.

The ALJ found Plaintiff had moderate difficulties in concentration, persistence, or pace. (Tr. 25). Substantial evidence supports this finding. In his Adult Function Report, Plaintiff noted he has difficulties with memory, concentration, following instructions, and completing tasks. (Tr. 210). Plaintiff also testified he gets easily frustrated. (Tr. 43, 52). However, Plaintiff also noted he drives a car, watches television and movies, and plays computer games. (Tr. 208-09). Regarding appropriate completion of tasks, Plaintiff cuts the grass, does his laundry, and prepares simple meals. (Tr. 66, 206). Finally, while Plaintiff's 2011 exam records note he had impaired memory and rapid speech, Plaintiff was also described as "logical" with no paranoia and a person of "average" intelligence. (Tr. 294-95). Based on this evidence, the undersigned finds substantial evidence supports the ALJ's conclusion that Plaintiff can sustain concentration, persistence, and pace.

The Court finds substantial evidence supports the ALJ's finding of no "marked" restrictions in activities of daily living, social functioning, and with regard to concentration, persistence or pace. Further, Plaintiff fails to argue the evidence identified "relates back" to before December 31, 2011, Plaintiff's date last insured. The Court, therefore, finds the ALJ did not err in finding, at Step Three, Plaintiff's impairments do not meet the requirements of Listing 12.04.

Step Five: ALJ's Error

Plaintiff argues that the ALJ erred at Step Five, because: (1) he did not accord controlling weight to the opinion letter of Susan Barker, MSN, CNS; (2) he either "ignored or dismissed" a third-party report by an independent VE Ronald Smolarski ("VE Smolarski"); and (3) he did not explain why he "rejected" certain portions of VE Burke's testimony. (Doc. 13, at 8-11).

First, "[t]he opinion of a 'non-acceptable medical source' is not entitled to any particular weight or deference—the ALJ has the discretion to assign it any weight he feels appropriate based on the evidence of record." *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 248 (6th Cir. 2015) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997)). The term "acceptable medical source" means licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513. As a nurse specialist, Ms. Barker is not an "acceptable medical source". *See Leach v. Comm'r of Soc. Sec.*, 2015 WL 1221925, at *9 (N.D. Ohio) ("nurse specialists are not listed as one of the five types of 'acceptable medical sources'"). Her opinion is, therefore, not entitled to controlling weight. Accordingly, Plaintiff's first argument fails.

Second, regarding Plaintiff's next argument, evidence is "only relevant to a disability determination where the evidence 'relates back' to the claimant's limitations prior to the date last insured." *May*, 2011 WL 3490186 at *5. Indeed, a plaintiff must explain why or how post-dating evidence is reflective of the plaintiff's disabilities prior to the plaintiff's date last insured. *Id*. Here, VE Smolarski's report is dated May 23, 2015. (Tr. 642). Plaintiff fails to argue how it "relates back" to before Plaintiff's date last insured, December 31, 2011. (Tr. 83). Therefore, the ALJ was not in error by failing to discuss VE Smolarski's report.

17

Third, Plaintiff argues the ALJ erred by failing to explain why he rejected VE Burke's answers to certain follow-up questions posed by the ALJ[6]. (Doc. 13, 9-11) ("The court did not explain why it rejected its own expert's testimony"). First, the fact that an ALJ does not explain why he or she rejects or accepts certain evidence does not mean it was not considered. *See Daniels*, 152 F. App'x at 489 ("[A]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered"). Further, the ALJ did explain he was going to reject the VE's answers here unless Plaintiff provided medical support for the testimony-based questions he asked:

> [T]he last three questions I asked are based primarily on the testimony that I've heard today. . . I can't base my decision [] entirely on what the claimant is telling

---

6. The Plaintiff takes issue with the follow questions and answers between the ALJ and the VE:

> Q. How many unscheduled absences will employers customarily tolerate from their employees per month in unskilled work?
> A. About once per month.
> Q. If an individual is absent on an unscheduled basis more than one time per month, would that likely lead to termination?
> A. Yes it would.
> Q. If an individual is off task 20% of the day in addition to regularly scheduled breaks, would that have an impact on their [sic] ability to perform the occupations that you've cited?
> A. It would definitely have an impact. There wouldn't be jobs.
> Q. Would there be any jobs at all in the national economy under these circumstances?
> A. No.
> Q. If an individual has intermittent explosive outbursts in the work setting, would that have an impact in the ability to perform the occupations that you've cited?
> A. Yes, I don't think that the individual would sustain employment that I cited with that kind of odd behavior.
> Q. So the employers would have no tolerance for that?
> A. That's right.

(Doc. 13, at 9-10).

me or entirely on what the claimant's wife is telling me. I need to have some medical support for that.

(Tr.76). Therefore, the Court finds the ALJ was not in error in failing to explain, again, why he rejected the VE's testimony here. *See Brewer v. Soc. Sec. Admin.*, 39 F. App'x 252, 254 (6th Cir. 2002) (It is not improper for an ALJ to reject testimony where the allegations are not supported by objective medical evidence); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (The ALJ is "required to incorporate only those limitations he accepted as credible" in the hypotheticals).

Step Five: VE's Error

Plaintiff takes issue with the fact that VE Burke "did not consider Plaintiff's mental illness" in responding to the ALJ's hypotheticals. (Doc. 13, at 10).

Under social security regulations, "a vocational expert testifies on the basis of a claimant's 'residual functional capacity and . . . age, education, and work experience' and assesses whether the claimant 'can make an adjustment to other work.'" 20 C.F.R. § 416.920(a)(4)(v). Where "[t]he ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form "an assessment of his residual functional capacity," 20 C.F.R. § 916.920(a)(4)(iv), "[t]he vocational expert is not expected to evaluate the claimant's medical conditions in making this determination. Indeed, vocational experts are not required to have any medical training, so any evaluation of medical evidence they perform would be outside their area of expertise." *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); *see also Casey*, 987 F.2d at 1235 (The ALJ is "required to incorporate only those limitations he accepted as credible" in the hypotheticals).

Here, the VE appropriately did not "consider factors, limitations, or impairments outside of the limitations [the ALJ] gave [her]." (Tr. 78-79). Indeed, the VE did not consider additional

19

limitations, including Plaintiff's "mental illness" in responding to the ALJ's hypotheticals. *Webb*, 368 F.3d at 633. Further, the ALJ is only required to accept limitations he deemed credible, and the Plaintiff did not challenge the ALJ's credibility assessment. *Casey*, 987 F.2d at1235. The Plaintiff's argument, therefore, is not well taken.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the undersigned finds the ALJ's decision is supported by substantial evidence. The undersigned, therefore, recommends the Commissioner's decision be affirmed.


                                                s/James R. Knepp II
                                                United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).